# DECLARATON IN SUPPORT OF CIVIL FORFEITURE

I, Sean P. Reilly, a Drug Enforcement Administration ("DEA") Special Agent, make the following unsworn declaration pursuant to 28 U.S.C. § 1746:

## I. BACKGROUND, TRAINING, AND EXPERIENCE

1. I have been a DEA Special Agent since May 2021. I am currently assigned to the Dallas Field Division, Enforcement Group 2, and conduct criminal investigations throughout the Eastern District of Texas and elsewhere. Over the course of my career, I have received specialized training regarding drug trafficking and money laundering from the United States Department of Justice. My career has included numerous long-term special assignments—in the United States and abroad—investigating drug enforcement and money laundering organizations ("DTOs" and "MLOs").

2. I am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General. I have participated in numerous investigations related to illegal drug trafficking, among other things, have conducted or participated in surveillance, the execution of search warrants, and debriefings of informants related to drug trafficking and money laundering. I have drafted affidavits for search warrants including tracking of vehicles, cellular phones, and searches of residences and electronic devices. I also consult with other agents with extensive experience in

drug trafficking investigations. As a result, I am familiar with common practices to promote and facilitate drug trafficking.

3. I am a Certified Anti-Money Laundering Specialist through the Association of Certified Anti-Money Laundering Specialists, which provides training and assists other organizations such as banks and law enforcement agencies through its internationally recognized program of anti-money laundering courses. As such, I specialize in detecting domestic and international money laundering activities throughout the use of several investigative tools. Within the DEA, the investigation into money laundering activity involves the laundering of illicit proceeds earned through the sale and distribution of controlled substances. Recognizing trends and patterns with modern-day money launderers is an integral part of conducting drug-related investigations, as the seizure of assets has been found to greatly cripple and disrupt DTOs and MLOs.

4. I am a certified user of multiple forms of software utilized to track the flow of assets, particularly cryptocurrency, as it exchanges possession and location(s). As such, I have been trained to detect indicators of money laundering and/or illicit activity using said software.

5. Based on my training and experience, I am aware of the following:

A. DTOs generate large amounts of cash proceeds in the U.S. and elsewhere. In order to repatriate their cash proceeds from the U.S. and other countries back to their country of

origin where they can be used by the DTO members, DTOs often employ professional money launderers. For a fee, professional money launderers provide the DTO with currency in the DTO's native country in exchange for bulk currency in the country where the DTO's narcotics are distributed.

B. Professional money launderers use a variety of methods to accomplish their goals, including trade-based money laundering, bulk currency smuggling, and virtual currency trading.

C. Professional money launderers typically charge a commission fee ranging from a 7% average for established, high-volume laundering (such as that found in fraud and drug-trafficking conspiracies) to 35% for heightened digital tracking risks and specialized mitigation needs (such as necessary with cybercrime proceeds) of the total capital being moved.

D. Other factors may influence the money launderer's fee: volume (small amounts vs. bulk wholesale laundering can command larger or smaller percentages respectively), urgency (fast turnaround times drive up the commission price), and method (using established shell companies or traditional banking may cost more than crypto-to-cash or trade-based laundering).

E. There are several red flags or warning signs common to money laundering operations:

(1) Withholding "Know Your Customer" Information—A customer's reluctance to provide (or a company's willingness to ignore said reluctance—especially a financial service company) complete identification, business purpose, or source of wealth;

(2) Identity Mismatch—A subject's background or lifestyle contradicts expected activity or declared income;

(3) Evasive Actions—Frequent changes to personal details, contact information, or avoiding face-to-face contact without reason;

(4) Unusual Representation—Use of nominees, proxies, or third parties to hide the real controller of funds;

(5) Rapid Movement—Money enters and leaves an account almost immediately (showing pass-through or conduit activity);

(6) Structuring (also known as "Smurfing")—frequent cash transactions under reporting thresholds;

(7) No Economic Rationale—Transfers or trades that make no logical business, personal, or financial sense;

(8) Shell Companies—Corporate entities with minimal actual business operations but high cash flow;

(9) Complex Ownership—Layered or opaque trust and corporate structures that obscure ownership;

(10) High-Risk Jurisdictions—Unexplained movement of funds to or from countries with lax anti-money laundering laws or active sanctions; and

(11) Unsolicited Third-Party Payments—Settlements or deposits arriving from unrelated corporate or individual accounts.

6. This Declaration is based upon my training and experience, as well as my personal knowledge derived from the investigation, review of reports, claims data, and public records, and information obtained from other agents or witnesses. Since this Declaration is being submitted for the limited purpose of establishing the basis for this civil forfeiture action, as set forth herein, I have not included each and every fact known to me concerning this investigation, but

only those facts that I believe are necessary to establish—more likely than not—that the assets listed below (the "**Defendant Property**") represents property which constitutes or is derived, directly or indirectly, from proceeds traceable to violations of 21 U.S.C. §§ 841 and 846 (Drug Trafficking and Conspiracy to Commit Drug Trafficking) and/or constituted proceeds of and/or were involved in, and/or used to facilitate violations of §§ 1956(a)(1)(B) (Money Laundering), 1956(a)(2) (International Money Laundering), 1956(h) (Conspiracy to Commit Money Laundering), and/or 1960 (Operating an Unlicensed Money Transmitting Business), and that the **Defendant Property** is therefore subject to civil forfeiture to the United States.

## II. PROPERTY TO BE FORFEITED

7. The **Defendant Property** consists of the following assets:

| **Asset ID** | **Asset Description** |
|---|---|
| 25-DEA-721766 | $110,791.00 U.S. Currency |
| 25-DEA-721933-01 | One (1) Money Counter DY-800P |
| 25-DEA-721933-02 | One (1) Money Counter DY-59DT |

Each of the assets was consensually seized on June 26, 2025, from Nhat Vinh Dinh Pham, at VS Trading LLC in Richardson, Texas. These assets are:

A. Funds traceable to, and are therefore proceeds of, distribution of controlled substances, committed in violation of 21 U.S.C. § 841, and therefore are subject to civil forfeiture under 21 U.S.C. § 881(a)(6);

B. Funds involved in, or traceable to funds involved in, unlicensed money transmitting, committed in violation of 18

U.S.C. § 1960, and therefore are subject to civil forfeiture under 18 U.S.C. §§ 981(a)(1)(A) and (C); and

C. Funds involved in, or traceable to funds involved in, money laundering offenses, committed in violation of 18 U.S.C. §§ 1956 and 1957, and therefore are subject to civil forfeiture under 18 U.S.C. §§ 981(a)(1)(A) and (C).

8. The **Defendant Property** is connected to assets seized from other members of the same conspiracy but have been included separately in the instant Complaint to avoid confusion regarding the probable cause for the other assets.

## III. PROBABLE CAUSE

### A. Drug Trafficking and Money Laundering Investigation

9. The DEA has been investigating multiple Mexican and Chinese organizations using trade-based money laundering to launder illicit proceeds, including the proceeds of drug trafficking.

10. On June 8, 2025, Task Force Officer Felipe Sauceda ("TFO Sauceda") and I spoke with a DEA Confidential Source ("CS") regarding money laundering activities involving Chinese subjects attempting to sell cash in the Dallas, Texas area in exchange for cryptocurrency transfers. The CS advised of a subject they knew only as "Mat," who had been communicating with the CS via WeChat. According to Mat's WeChat, Mat was based in Beijing.

11. The CS sent me screenshots showing conversations between the CS and Mat, who asked where in Texas the CS was located. Mat also advised "... I

can give you cash in TX." Mat added "I'll give you a quotation tomorrow." On June 10, 2025, Mat asked the CS "If you give me USDT, what currency will I give you?" The CS responded by asking Mat if they had cash available in Dallas. Mat stated "I have friends in Dallas who can arrange cash. How is the exchange rate calculated?"

12. That same day, Mat messaged the CS again and advised "hi, boss, I contacted my friend, his cash is clean, Can we improve the exchange rate? Cash is not gambling money."

13. On June 11, 2025, Mat asked the CS, "Brother, where is your Dallas address?" Mat and the CS then organized a phone call which the CS was able to partially record. During the phone call, the CS spoke English to an unknown Chinese female ("UF") who was heard translating for an unknown Chinese male who appeared to be in the background. UF asked the CS if the CS could drive to the UF's friend's office—located in Dallas—to pick up cash. UF advised the total amount of cash that would be turned in would be $10,000 U.S. Currency to start. The CS asked UF to send the CS the UF's friend's address.

14. The CS and UF ultimately confirmed that the meeting would occur the following day, June 12, 2025. UF advised the CS that the UF would contact her friend to arrange the meeting with the CS. On June 11, 2025, at approximately 8:00 PM, Mat told the CS that the meeting location for the

following day was 100 North Central Expressway Service Rd, Richardson, Texas, reminding the CS that the meeting was set for the next day at 11 a.m.

15. On June 12, 2025, at approximately 9:35 a.m., Mat sent the CS a TRON[1] cryptocurrency address. Mat instructed the CS to "[m]eet my friend later, first transfer 10, I confirm received, then transfer the balance." Mat also provided his friend's phone number as "469 615 0335,"[2] adding "My friend's number... Vinh... Contact my friend before departure." Following Mat's instructions, the CS contacted the number and spoke with a subject later identified as Nhat Vinh Dinh Pham ("Pham"). Pham confirmed the meeting and ultimately asked the CS to meet him inside the Chase Bank located at 100 North Central Expressway, Richardson, Texas. The CS agreed.

16. The CS was then surveilled to the bank location, where surveillance units were already established. Surveillance personnel observed Pham walking around outside with a black bag. The CS and Pham greeted each other outside Chase Bank before going inside and speaking at a seating area in the lobby. During the conversation, Pham said that he was just supposed to drop the cash

---

1 TRON is a decentralized, open-source blockchain-based operating system with its own native cryptocurrency called Tronix ("TRX").

2 There are two businesses associated with this phone number, a Dallas electric bicycle store and a business buying new and used electronics. Both businesses appear to be associated with Nhat Vinh Dinh Pham. Pham mentioned to the CS that he and his partner own a company in Dallas where they sell phones, LCDs, and toys.

to the CS and that was it. Pham said that his friend had not told him about the meeting until that morning.

17. Pham stated he was going to call Mat and then the CS and Pham could go to Pham's office to count the money. The CS asked Pham if the exchange could happen in the Chase Bank lobby where they were speaking, but Pham declined, alluding to the fact that there were cameras, and it was the first time dealing with the CS.

18. The CS asked Pham what he does. Pham stated he buys electronics and added "I help him pay people," which I believe to be a reference to Pham's duties of collecting cash and organizing cryptocurrency transfers for Mat and other unknown brokers.

19. The CS asked Pham if he used cryptocurrency and Pham stated he previously used cryptocurrency for his own money, but then he "got a little greedy." The CS asked how much Pham could do weekly, and Pham began explaining that he could do as much as needed but then advised that he was focused on completing the current transaction. Pham stated that he was very careful.

20. Pham made a phone call using his speaker phone. During the phone call, Pham stated, "Hey Ben, he's here with me." Pham also asked Ben to send him the USDT wallet, and the CS advised that the wallet was already passed. Pham asked Ben if it was okay that the CS and Pham went to the

office. Pham advised the CS that they would wait and see how "they" wanted to do it.

21. Pham then showed the CS a message on Pham's phone showing that $20,700 U.S. Currency was to be transferred to the CS. The CS advised they had to count the money first. Pham then invited the CS to Pham's truck, so that they could go to the Bank of America together. As the CS and Pham were walking outside to Pham's truck, Pham received a message from Ben authorizing CS and Pham to use an office equipped with a counting machine to count the money.

22. The CS and Pham walked back inside and took an elevator to the 9th floor, entering Suite 904, which belonged to VS Trading LLC. While inside Suite 904, the CS and Pham counted multiple large stacks of $100 bills removed from a white envelope that Pham took out of his bag. According to the conversation, the money totaled $20,700 U.S. Currency and was counted using a bill counter machine that Pham retrieved from another room inside the suite.

23. Pham then asked the CS to send the transfer for the U.S. Currency. The CS, as previously instructed by TFO Sauceda and me, asked Pham to follow the CS to the nearby Bank of America to deposit the $20,700 first, and then the transfer would be completed. The CS advised Pham that while the money was being deposited into the bank, the CS and Pham could wait together outside the bank. Pham agreed.

24. Pham walked out to his truck parked outside the Chase Bank building, while the CS drove the CS's own vehicle to a nearby Bank of America. On the drive there, Pham made multiple erratic maneuvers, including a U-turn, and began traveling in the opposite direction of the CS.

25. After several minutes, the CS contacted Pham again and Pham advised "I told them i never do transactions like this so, i rather not get involve. Thank you, you can contact them directly maybe they can appoint some other person for you." PHAM also stated "I was doing it as a favor for a friend anyway, he currently in china that why, and the whole thing doesn't sit too well with me . Sorry . You can work with him directly I guess."

26. The CS also contacted Mat, who stated "My friend needs money today, so he can't give me cash… I'll find other friends. When I find it, we'll make a deal."

27. On June 26, 2025, agents had intended to conduct a search warrant at Pham's Savannah, Texas residence, but Pham was leaving the residence, and the agents did not catch up with him until he reached his office at VS Trading. As agents approached the door, they heard a money counter operating inside the suite. Agents entered the lobby area of the suite and were greeted by Pham, who exited an office inside the suite. Group Supervisor Marcus West ("Group Supervisor West") and I identified ourselves as law enforcement. Pham was immediately cooperative and compliant. In plain view, agents could see large

amounts of cash on the desk inside the office Pham exited prior to greeting the agents. Pham also admitted to having firearms in the office.

28. Pham agreed (verbally and in writing) to let Group Supervisor West and I search the suite, which he shares with his business partner, Kaijun "Ben" Guo (hereinafter "Guo"). Shortly thereafter, Guo walked inside the suite and was detained. Guo confirmed he was Pham's business partner.

29. Both Pham and Guo were advised that they were not under arrest and could leave at any time.

30. Pham stated that the large amount of cash in the office came from businesses, including businesses owned by Guo and himself in the Dallas, Texas area, and was to be used to purchase electronics to send to domestic and international clients. Pham stated that approximately 50% of his customers are overseas and in China.

31. Pham stated that several minutes prior to agents entering the suite, a subject had just dropped off approximately $20,000 U.S. Currency in cash that would be used to purchase and sell electronics on behalf of the company. When asked who the cash belonged to, Pham could not answer but stated that Guo communicated with a Chinese subject known only as "Mat" to arrange the deliveries. Pham later advised he would travel to locations throughout the Dallas, Texas area to collect cash from other businesses such as salons, massage parlors, and restaurants.

32. Pham gave me verbal consent to search his phone. I located a "WeChat" conversation with "GUORN0663." Pham stated that GUORN0663 was GUO's assistant, who would often contact Pham to arrange the collection of cash when Guo was unavailable. The WeChat conversations—going back to December 2024—involved GUORN0663 communicating to Pham about money to be delivered to Pham or asking PHAM to collect at an address GUORN0663 provided. In one of the messages, made on December 28, 2024, GUORN0663 wrote Pham "Hello brother! Tonight the door collection amount changed to 43,000, the time is 10 o'clock sharp." These messages continued through June 26, 2025, when, at 10:31 a.m., GUORN0663 messaged Pham "Receive cash 20,000 + 600 = 20,600". At 10:36 a.m., GUORN0663 advised "The third customer will arrive at 1:00 p.m.. Receive 35,000 + 1,050 = 36,050."

33. I also located WeChat conversations between Mat and Pham on the phone. Pham said that Mat was Guo's client who was involved in arranging the bulk cash to Guo and Pham.

34. Pham stated that occasionally, he deposited the cash into his and Guo's Chase bank account, and sometimes he delivered it to businesses in the Dallas, Texas area who prefer to accept cash in exchange for cell phones and electronics.

35. Group Supervisor West and I then spoke with Guo, who claimed that the money delivered to the office belonged to him but could not explain

where the money came from, and or why strangers were delivering the money to the business. I told Guo that his statements were unusual and asked Guo who organized the delivery of the money. Guo insisted he did not know.

36. Guo was asked who owns the truck that Guo was driving, which Pham had previously used to transport illicit proceeds on June 12, 2025. Guo stated he purchased the truck from "Christina," and was making private payments to her for the truck. Knowing that the truck was currently registered to a DEA fugitive named Mohammed Tahiri, Group Supervisor West and I asked Guo several more times who the truck belonged to. After asking approximately 5 times, Guo finally admitted that the truck previously belonged to a subject he knew as "Mohammed," who was currently living in Morocco. I asked Guo why he did not mention that earlier, and Guo could not explain.

37. Guo eventually admitted to having been responsible for collecting bulk cash for a subject based in China that he knows as Mat. According to Guo, Mat would send Guo and Pham to residences and businesses located throughout the Dallas, Texas area. Often, Mat sends money couriers directly to VS Trading for them to deliver bulk cash.

38. During a search of the business suite, another agent and I located miscellaneous paperwork, two money counters in Pham's office and a cell phone belonging to Guo. GUO consented to a search of the cell phone. We also found bulk cash, located throughout the office, including in an open safe, on top of the

desk, and in the desk drawers. Another agent witnessed me securing the U.S. Currency, which was later determined to total $110,791 U.S. Currency.

39. Guo's phone revealed communication between and two other individuals ("Wu" and "John"). These messages include a May 16, 2024, invitation from a known money launderer to Guo, "Robin," and John for a WeChat group called "Payment." The money launderer subsequently sent a message "51800x1.02=52836." Subsequently, Guo sent a message in the chat: "Total dropped 51k." John subsequently advised "Received $54836."

40. Neither Pham nor Guo were arrested; both were released after being questioned.

41. Neither Pham nor Guo has a prior criminal drug history. According to Texas state employment records, Pham's last reported wages were in the fourth quarter of 2022, while a check for Guo's records found no wages reported.

42. Based upon all of the foregoing, there is probable cause to believe that the **Defendant Property** constitutes property traceable to the distribution and sale of narcotics in violation of 21 U.S.C. § 841, and/or are property involved in money laundering and unlicensed money transmitting in violation of 18 U.S.C. §§ 1956 and 1960, respectively.

43. Pursuant to 18 U.S.C. § 1956, it is unlawful, in part, to conduct a financial transaction, knowing that the property involved in the financial transaction represents the proceeds of some form of specified unlawful activity,

knowing that the transaction is designed in whole or part to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity.

44. Likewise, 18 U.S.C. § 1960 makes it unlawful to engage in an unlicensed money transmitting business. An unlicensed money transmitting business is defined as one which affects interstate or foreign commerce in any manner or degree, is operated without an appropriate license in a state, whether or not the transmitter knew that the operation was required to be licensed, is not in compliance with the money transmitting business registration requirements under 31 U.S.C. § 5330, which requires that money transmitting businesses be registered with the Secretary of the Treasury, or otherwise involves the transportation or transmission of funds that are known by the transmitter to have been derived from a criminal offense, or are intended to be used to promote or support unlawful activity.

45. Accordingly, I submit that there is probable cause to support the civil forfeiture of the **Defendant Property**, pursuant to 21 U.S.C. § 881(a)(6) (civil forfeiture of drug proceeds) and 18 U.S.C. §§ 981(a)(1)(A) and (C) (civil forfeiture of property involved in money laundering and unlicensed money transmitting).

I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct. Executed on October 13, 2026.

Sean P. Reilly
Special Agent
Drug Enforcement Administration